THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In re:  LandAmerica Financial Group, Inc., *et al.*, | Case No. 08-35994-KRH |
| | Chapter 11 |
| Debtors. | |
| | |
| BRUCE H. MATSON, Trustee of the LAC Liquidation Trust, | |
| Plaintiff, | |
| v. | APN 13-03105-KRH |
| AMERICAN CAPITAL, LTD., | |
| Defendants. | |

## MEMORANDUM OPINION

Before the Court are cross motions for summary judgment (the "Motions") filed by Plaintiff Bruce H. Matson ("Matson"), in his capacity as trustee for the LandAmerica Assessment Corporation Liquidation Trust (the "LAC Trust"), and by Defendant American Capital, Ltd. ("American Capital") seeking summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure (the "Civil Rules"), as incorporated by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Motions concern the allowability under 11 U.S.C. § 501 of proof of claim number 3120 (the "Claim") filed by American Capital in the Chapter 11 bankruptcy case of LandAmerica Assessment Corporation.

The Court took the Motions under advisement following a hearing conducted on December 19, 2013. Finding insufficient contractual privity or its equivalent between American Capital and LandAmerica Assessment Corporation for the imposition of tort liability against the

LAC Trust, the Court will grant the motion for summary judgment filed by Matson. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.[1]

## Procedural Background

On November 26, 2008 (the "Petition Date"), LandAmerica Financial Group, Inc. ("LFG") and LandAmerica 1031 Exchange Services, Inc. (the "Initial Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Thereafter, various LFG affiliates including LandAmerica Assessment Corporation ("LandAmerica Assessment") also commenced voluntary cases under Chapter 11 of the Bankruptcy Code in this Court (the "Affiliated Debtors").[2] The bankruptcy case of LandAmerica Assessment is being jointly administered with the Initial Debtors and their other LFG Affiliated Debtors under case number 08-35994.[3]

By Order entered April 22, 2009, all non-governmental persons and entities were required to file proofs of claim against the estate of LandAmerica Assessment by May 18, 2009. American Capital filed a motion on May 15, 2009, seeking authority to conduct an examination of LandAmerica Assessment under Bankruptcy Rule 2004 (the "2004 Motion").[4] Before this

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

[2] LandAmerica Assessment was engaged in the business of providing property condition assessments associated with commercial real estate acquisitions and finance. LandAmerica Assessment filed its Chapter 11 voluntary petition in this Court on March 6, 2009 (the "Petition Date"). The bankruptcy case was assigned number 09-31453-KRH.

[3] *See* order entered March 11, 2009, in case number 09-31453-KRH.

[4] Prior to the Petition Date, American Capital had filed a lawsuit (the "Lawsuit") against LandAmerica Assessment in the Circuit Court for Montgomery County, Maryland. The Lawsuit was removed to the U.S. District Court for the District of Maryland by Notice of Removal dated December 24, 2008. The Lawsuit was stayed by order dated March 16, 2009, after LandAmerica Assessment filed its bankruptcy case. In its 2004 Motion, American Capital sought information and documents from LandAmerica Assessment so that American Capital could determine

2

Court had an opportunity to rule on the 2004 Motion, American Capital filed a Motion to Amend Informal Proof of Claim in which American Capital sought leave to file a formal proof of claim to amend its informal claim asserted via its 2004 Motion. The Court granted American Capital's Motion to Amend by order entered November 13, 2009. Once American Capital was permitted to file a formal proof of claim, it withdrew the 2004 Motion by stipulation dated November 20, 2009.

The Court confirmed the Joint Chapter 11 Plan of LFG and its Affiliated Debtors (the "Plan") by order entered November 23, 2010.[5] The Plan established the LAC Trust, and it appointed Matson as the fiduciary responsible for administering the LAC Trust. Predicated on the allegations set forth in its Lawsuit, American Capital filed a Claim against the LAC Trust in the amount of $10,190,000 on December 11, 2009. Matson filed his objection to the Claim on March 30, 2012, and thereafter commenced this adversary proceeding.[6]

The Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

---

whether LandAmerica Assessment had insurance coverage on the claims American Capital had asserted in the Lawsuit.

[5] The Plan did not consolidate the various bankruptcy estates of LFG and the Affiliated Debtors; but, rather, created separate liquidating trusts for each debtor.

[6] Matson filed the complaint so that his objection to the Claim could be adjudicated with all the procedural requirements and safeguards incumbent in the format of an adversary proceeding. *See, e.g., Moi v. Asset Acceptance LLC (In re Moi)*, 381 B.R. 770, 772 (Bankr. S.D. Cal. 2008) ("Nothing in the Rules or Code specifically precludes an objection to claim being brought as an adversary proceeding and the Court can think of no practical reason to so hold. The adversary procedure imposes no additional hardship on the claimant and, in fact, it affords a claimant heightened due process.").

**Facts**

On February 15, 2006, Wachovia Bank, N.A. ("Wachovia") originated a loan in the principal amount of $13,950,000 (the "Westfield Loan") for the refinance of existing debt by 2003 Westfield Apartments, L.P., an affiliate of Trimark Realty Investments, Inc. (the "Borrower"), on a 424-unit garden style apartment complex located at 14405 Rio Bonito Road, Houston, Texas (the "Westfield Apartments"). On June 11, 2006, Wachovia originated a loan in the principal amount of $6,000,000 (the "Pines Point Loan," and together with the Westfield Loan, the "Loans") for the refinance of existing debt by Oradell/321-Dallas, L.P., also an affiliate of the Borrower, on a 318-unit garden style apartment complex located at 3102 Oradell Lane, Dallas, Texas (the "Pines Point Apartments," and together with the Westfield Apartments, the "Apartment Complexes").

LandAmerica Assessment had been retained by the Borrower to assess the condition of each of the Apartment Complexes in connection with Wachovia's loan underwriting process. LandAmerica Assessment issued two reports separately describing the condition of the Pines Point Apartments and the Westfield Apartments (the "Property Condition Reports").[7] The Apartment Complexes were described in the Property Condition Reports as generally being in good condition collectively requiring less than $125,000 in immediate repairs.[8]

---

[7] In originating the Loans, Wachovia obtained appraisal reports in addition to the Property Condition Reports. CB Richard Ellis had been engaged to appraise the Westfield Apartments and Joseph J. Blake and Associates Inc. had been engaged to appraise the Pine Point Apartments. There is no suggestion that the appraisers relied upon the Property Condition Reports in connection with the preparation and issuance of their respective appraisal reports, which independently established an estimate of value for the collateral securing the Loans.

[8] The Property Condition Report issued for the Pines Point Apartments revealed that the apartment complex was in "fair to good overall condition" but requiring $100,000 in immediate repairs and $900,000 in long term capital expenditures. The Property Condition Report defined "good" condition as: "Average to above-average condition for the building system or material assessed, with consideration of its age, design, and geographical location. Generally, other than normal maintenance, no work is recommended or required." The Westfield Property Condition Report revealed that the apartments "appear[ed] to be in good physical condition" and required $23,000 in immediate repairs and over $1.2 million in long term capital expenditures. The report defined "good" as: "Satisfactory as is."

4

After making the Loans, Wachovia sold them together with other multifamily and commercial loans to Wachovia Commercial Mortgage Securities, Inc. That entity thereupon sold the loans into a commercial mortgage backed security trust.[9] The Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2006-C26 (the "Wachovia Trust") consisted of 117 loans with a total value of $1.755 billion. American Capital alleges that it bought bonds issued by the Wachovia Trust. American Capital closed on its purchase of the securities in June of 2006.

Both of the Property Condition Reports issued by LandAmerica Assessment contained the following language in a section entitled reliance:

> Wachovia Bank, National Association, its employees, agents, successors and assigns, together with its advisors, may circulate, use, copy and rely upon this report in evaluating a request for an extension of credit to be secured by the Subject Property. This report may also be circulated, used, copied and relied upon by . . . any actual or prospective investor (including agent or advisor) in any securities evidencing a beneficial interest in or backed by the Mortgage Loan (or any portion thereof). . . .  In addition, this report or a reference to this report may be included or quoted in any offering circular, private placement memorandum, registration statement or prospectus or other related documents and LandAmerica Assessment Corporation agrees to cooperate in answering questions by any of the above parties in connection with a securitization or transaction involving the Mortgage Loan (or any portion thereof) and/or such securities.

American Capital alleges that, based upon this language, LandAmerica Assessment assumed a duty of care to the investors in the Wachovia Trust. The bonds American Capital purchased in the Wachovia Trust were subordinate certificates commonly known as the B-piece. American Capital bought the bonds, which had a face value of $46,696,767.36, for $24,699,102.48. The

---

[9] A typical mortgage-backed securitization begins with a sponsoring financial institution, such as Wachovia, bundling numerous mortgage loans together and then conveying the package of bundled loans to a subsidiary depositor, such as Wachovia Commercial Mortgage Securities, Inc. The subsidiary depositor then sells the bundled loans to a trust, which then holds the bundled loans and issues securities to the investing public. The proceeds from the sale of the securities are up-streamed to the subsidiary depositor to pay for the bundled loans. The securities, which are to be repaid from the mortgage payments made on the loans, are typically divided into tranches, based upon their credit worthiness. The higher rated tranches, those receiving a triple A rating, have the least risk of loss because they are repaid first. The lower rated tranches have a higher rate of return but greater commensurate risk.

5

difference between the two amounts represents the discount given the inherent risk of the securities. The owner of the B-piece suffers the first loss when any loan held by the trust goes into default.[10] American Capital maintains that it reviewed and relied upon the Property Condition Reports prepared by LandAmerica Assessment before investing in the Subordinate Certificates issued by the Wachovia Trust. American Capital alleges that LandAmerica Assessment breached the duty of care that it owed to investors in the Trust by materially misrepresenting the condition of the Apartments.

Less than a year after Wachovia originated the Loans, both Loans went into default. Servicing of the Loans was transferred at American Capital's direction to a special servicer on March 8, 2007.[11] The Special Servicer commenced foreclosure proceedings against the Apartment Complexes, which collateralized the Loans. The foreclosure sale was circumvented when, on July 13, 2007, a court-appointed receiver took possession of and title to the Apartment Complexes.

On July 24, 2007, American Capital sold all of its right, title and interest in the Subordinate Certificates it owned in the Wachovia Trust to a new commercial real estate collateralized debt obligation trust formed by American Capital known as the CRE Trust.[12] The CRE Trust sold bonds with an overall face value of $1.175 billion to the general investing public and the proceeds from the sale of those bonds were "up-streamed" to American Capital (the

---

[10] The "B-piece" securities represented 100% of the non-investment grade (BB+, BB, BB-, B+, B, B- and non-rated) Commercial Mortgage Pass-Through Certificates in the Wachovia Trust (the "Subordinate Certificates"). As such, they were the last tranche in the Wachovia Trust entitled to recover any principal repayment.

[11] As the controlling class representative under the Wachovia Trust Pooling and Service Agreement dated June 1, 2006, American Capital had the authority to direct the special servicer, LNR Partners, Inc., to take action with respect to the Loans.

[12] The parties refer to ACAS CRE CDO 2007-1 Ltd. as the "CRE Trust".

"CRE Trust Re-securitization").[13] As a result of the CRE Trust Re-securitization, the CRE Trust became the owner of the Subordinate Certificates that American Capital had originally held in the Wachovia Trust.[14]

The condition of both of the Loans, which continued to be owned by the Wachovia Trust, deteriorated further over the course of the year following the CRE Trust Re-securitization.[15] In May of 2008, the court-appointed receiver was directed to sell the Apartments. American Capital compounded the complexity of this factual scenario when it formed two wholly owned, special purpose entities to acquire the Apartment Complexes. The Pines Point Apartments were sold to Oradell Lane Holdings, L.P. ("Oradell") in consideration for its assumption of the Pines Point Loan, and the Westfield Apartments were sold to Rio Bonito Holdings, L.P. ("Rio Bonito") in consideration for its assumption of the Westfield Loan (Oradell and Rio Bonito are jointly referred to as the "American Capital Special Purpose Entities"). The American Capital Special Purpose Entities improved the physical condition and the operating performance of the Apartment Complexes after taking ownership of them. Both of the Loans that the American Capital Special Purpose Entities assumed are currently performing with payments coming from operations of the Apartment Complexes. Accordingly, the Wachovia Trust experienced no loss on account of the Loans.

---

[13] Matson contends that American Capital bundled B-pieces from various of its commercial mortgage backed securitizations and put the bundled B-pieces into this new collateralized debt obligation trust. By dividing the securities in the new trust into tranches and then selling securities in the new trust to the investing public, American Capital was able to "turn triple B below investment grade bonds into . . . some with investment rating grade, some with triple A." (Chris McCormack Dep., Ex. 18 at 48:1-49:15).

[14] American Capital contends that it retained bonds with a face value of $668 million from the aggregate pool of bonds sold and that only $396 million of third party proceeds were up-streamed to it.

[15] The sale by American Capital of its beneficial interest in the Wachovia Trust had no bearing upon the assets held by the Wachovia Trust.

As it turned out, the Apartment Complexes were in much greater need of significant short-term repairs than those identified in the Property Condition Reports.[16]  American Capital alleges that, after the American Capital Special Purpose Entities purchased the Apartment Complexes, it was required to spend $3.6 million to repair the Apartment Complexes in order to put them into the condition in which LandAmerica Assessment had represented them to be in the two Property Condition Reports.

**Standard of Review**

Summary judgment "is favored as a mechanism to secure the 'just, speedy, and inexpensive determination' of a case" when the requirements of Civil Rule 56 are met. *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1322–23 (4th Cir. 1995) (quoting Fed. R. Civ. P. 1).  Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  Summary judgment is appropriate when there are no "disputes over facts that might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The relevant inquiry on summary judgment is:

> whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  An otherwise "properly supported motion for summary judgment" will not be defeated by the existence of merely any factual dispute, no matter how minor; rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  To withstand a summary judgment motion, the non-moving party must produce competent evidence sufficient to reveal the existence of a genuine issue of material fact for trial.  Neither conclusory allegations, speculative scaffolding of

---

[16] Matson argues that the condition of the Apartment Complexes deteriorated between early 2006 and 2008 as a direct result of the Borrower's neglect.

8

one inference upon another, nor the production of a "mere scintilla of evidence"
in support of a nonmovant's case suffices to forestall summary judgment.

*Moody v. Arc of Howard Cnty., Inc.*, 474 F. App'x 947, 949 (4th Cir. 2012) (citations omitted). "[O]nce the moving party has identified the absence of a genuine issue of material fact, the nonmoving party bears the burden of identifying specific facts that demonstrate the existence of a genuine issue for trial." *Hopkins v. Horizon Mgmt. Servs., Inc.*, 302 F. App'x 137, 139 (4th Cir. 2008).

## Discussion

Matson argues that American Capital lacks standing to advance its Claim against the LAC Trust. Matson points out that American Capital can assert only its "own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975) (citing *Tileston v. Ullman*, 318 U.S. 44, 63 S. Ct. 493, 87 L. Ed. 603 (1943); *United States v. Raines*, 362 U.S. 17, 80 S. Ct. 519, 4 L. Ed. 2d 524 (1960); *Barrows v. Jackson*, 346 U.S. 249, 73 S. Ct. 1031, 97 L. Ed. 1586 (1953)).[17] Matson argues that any losses that may have been incurred as a result of the actions or omissions of LandAmerica Assessment were necessarily suffered by the Wachovia Trust not by any individual bondholder. *Friedman v. Chesapeake & Ohio Ry. Co.*, 261 F. Supp. 728, 731 n.7 (S.D.N.Y. 1966), *aff'd*, 395 F.2d 663 (2d Cir. 1968), *cert. denied*, 393 U.S. 1016 (1969) (quoting *Quirke v. St. Louis-San Francisco Ry. Co.*, 277 F.2d 705, 709 (8th Cir.), *cert. denied*, 363 U.S. 845 (1960)). Matson argues that any standing American Capital might have been able to assert on behalf of the Wachovia Trust (for which he asserts there is

---

[17] "Standing is a threshold jurisdictional question which ensures that a suit is a case or controversy appropriate for the exercise of the courts' judicial powers under the Constitution of the United States." *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001). If a party does not have standing, federal courts lack subject matter jurisdiction over the asserted claims. *Atlantigas Corp. v. Columbia Gas Transmission Corp.*, 210 F. App'x 244, 247 (4th Cir. 2006) (unpublished); *see also Miller v. Pacific Shore Funding*, 92 F. App'x 933, 937 (4th Cir. 2004) (unpublished) (affirming dismissal for lack of subject matter jurisdiction on the ground that a debtor lacked standing).

none) disappeared once American Capital sold its interest in the Subordinate Certificates to the general public as part of the CRE Trust Re-securitization.[18] Accordingly, Matson asserts that he is entitled to summary judgment disallowing the American Capital Claim.

American Capital refutes these contentions arguing that, while it may no longer own the Subordinate Certificates in the Wachovia Trust, it does hold the B-piece in the CRE Trust. American Capital maintains that the true nature of its original investment did not change as a result of the re-securitization of its investment. It argues that the CRE Trust Re-securitization was no different than refinancing a mortgage on a home. American Capital observes that the CRE Trust is the entity that is entitled to receive the cash flows generated by the Wachovia Trust B-piece, not the investing public. American Capital argues that it does have standing to bring its Claim because, as holder of the B-piece in the CRE Trust, it is the injured party. American Capital contends that it remains in the exact same position vis-à-vis the Loans as it did with the Wachovia Trust.

Matson counters that American Capital's argument is without moment as the CRE Trust Re-securitization resulted in a full recovery by American Capital of the funds it had invested in the Wachovia Trust plus a substantial profit. Matson alleges that American Capital sold the Subordinated Certificates it had purchased in the Wachovia Trust for $24,699,102,48 to the investors in the CRE Trust for $46,696,767. The compelling conclusion is that American Capital was repaid in full including interest equal to its requested yield.

Recoverable damages in a claim founded on an omission related to the purchase or sale of a security are calculated by looking to the difference between the purchase price and the

---

[18] Matson maintains that when American Capital ceased to be a bondholder under the Wachovia Trust, American Capital lost any ability it may have had as the controlling class representative under the Wachovia Trust Pooling and Servicing Agreement to direct the assertion of a Claim for alleged undisclosed deficiencies in the condition of the collateral securing the debt held by the Wachovia Trust.

10

amount received when the security is subsequently sold. *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970); *accord Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 603 (2d Cir. 1978). Matson argues that American Capital has no recoverable damages based on its Claim for omission arising in connection with its purchase of the Subordinated Certificates because it has recouped the full amount of its original investment. Matson argues that American Capital lacks standing to bring the Claim because it suffered no loss.

American Capital replies that this argument purposely misconstrues the nature of its Claim. American Capital asserts that its Claim is not predicated on losses incurred in connection with its securities investment. American Capital does not seek to recover damages as an investor in the Wachovia Trust. Rather, it is pursuing a Claim for the direct and out of pocket expenses it individually incurred in order to mitigate damages and avoid such losses.[19] As the owner of the first loss position in the CRE Trust, American Capital maintains that it is entitled to recover as damages the amount it spent to avoid losses that the Wachovia Trust might have incurred. American Capital argues that by purchasing the Apartments, assuming the Loans, and making the necessary repairs that LandAmerica Assessment failed to identify, American Capital prevented the Wachovia Trust from suffering any losses relating to the default that occurred on the Loans. The CRE Trust was thus able to avoid any loss it might have experienced on its investment in the Wachovia Trust.

Matson asserts that this Claim must fail because American Capital is seeking to recover purely economic damages based upon an action sounding in tort. The parties agree that there is

---

[19] American Capital argues that a party whose "interests have been endangered by the tortious conduct of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert the harm threatened." Citing *Restatement (Second) of Torts* § 919(1).

11

no contractual privity between American Capital and LandAmerica Assessment.[20] Maryland adheres to the economic loss rule, which provides that purely economic losses may be recovered only in a breach of contract action.[21] *Superior Bank, F.S.B. v. Tandem Nat. Mortg., Inc.*, 197 F. Supp. 2d 298, 310 (D. Md. 2000) (citation omitted). "[W]hen a 'controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between businessmen, it is plainly contract law which should provide the rules and principles by which the case is to be governed.'" *Id.* (quoting *Flow Indus., Inc., v. Fields Constr. Co.,* 683 F. Supp. 527, 530 (D. Md. 1988)). Absent a provision in the operative agreement providing for cumulative remedies, the economic loss rule bars recovery of economic losses in both fraud and negligence actions. *Id.* at 311; *see also Sun-Lite Glazing Contractors, Inc. v. J.E. Berkowitz, L.P.*, 37 F. App'x 677, 679 (4th Cir. 2002) (citing *A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 333 Md. 245, 634 A.2d 1330, 1333 (1994)) (finding that there can be "no recovery under a negligence theory for purely economic losses").

American Capital counters that the economic loss rule is inapplicable to this case, as its Claim is premised upon negligent misrepresentation. Negligent misrepresentation claims are not subject to the economic loss rule under Maryland law. *See Lloyd v. Gen. Motors Corp.,* 397 Md.

---

[20] American Capital argues emphatically that it is not a third party beneficiary. If it were, then it would be bound by the contractual $50,000 limitation on liability set forth therein. *Schrier v. Beltway Alarm Co.,* 73 Md. App. 281 (1987). *See also Superior Bank, FS.B. v. Tandem Nat'l Mortg., Inc.,* 197 F.Supp 2d 298, 310 (D. Md. 2000) (applying economic loss rule to "purely economic losses allegedly caused by statements made during the course of a contractual relationship between businessmen.") (quoting *Flow Indus., Inc., v. Fields Constr. Co.,* 683 F.Supp. 527, 530 (D. Md. 1988)).

[21] This Court is obligated to follow the forum state's choice of law rules in determining which jurisdiction's substantive law governs a plaintiff's tort claims. *Cremi v. Brown*, 955 F. Supp. 499, 522 (D. Md. 1997), *aff'd sub nom.*, *BancaCremi, S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017 (4th Cir. 1997) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S. Ct. 1020, 1021-22, 85 L. Ed. 1477 (1941)). As American Capital filed its lawsuit in Maryland, and as that lawsuit was subsequently removed to federal district court in Maryland, Maryland choice of law rules apply. "For tort claims such as [one for negligent misrepresentation], Maryland applies the *lex loci delecti* doctrine, i.e., it applies the law of the jurisdiction where the alleged wrong occurred." *Id.* The *Cremi* court held that, in a negligent misrepresentation case, the wrong occurs in the place where the misrepresentation is made. *Id.* Therefore, the Court will apply Maryland substantive tort law, as Wachovia transmitted the Property Condition Reports to American Capital in Maryland.

108, 137, 916 A.2d 257, 273-74 (2007) (economic losses qualify as a cognizable injury under negligent misrepresentation). In order to prevail on its claim for negligent misrepresentation, American Capital must prove:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.[22]

While Matson acknowledges this exception to the general rule, he observes that Maryland law requires an intimate nexus between the parties as a condition to the imposition of such tort liability for economic loss. *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.,* 430 Md. 197, 214, 60 A.3d 1, 11 (2013). Matson claims that prospective purchasers of the Apartment Complexes were unknown to LandAmerica Assessment at the time it prepared the Property Condition Reports. While investors in the Wachovia Trust may have had a right to rely upon the Property Condition Reports, American Capital's Claim that it was damaged as a result of its acquisition of the Apartment Complexes places it among an "indeterminate class" of third parties with whom LandAmerica Assessment had no "link." *Id.* at 215, 60 A. 3d at 11 (citing *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441, 445 (1931) (no tort liability imposed because there was no privity or close relationship given that "the third party was part of an 'indeterminate class of persons'")).

---

[22] Matson disputes that the Property Condition Reports were inaccurate as of the dates on which they were prepared. Matson also disputes that American Capital reasonably or justifiably relied on the Property Condition Reports in making its investment decisions, as American Capital conducted its own due diligence and inspections and had knowledge independent of the Property Condition Reports that precluded its ability to rely upon them. *Bank of Montreal v. Signet Bank,* 193 F.3d 818, 827-28 (4th Cir. 1999) (holding that a party cannot claim justifiable reliance, if that party undertakes a full investigation of the information misrepresented to him); *Hitachi Credit Am. Corp.*, 166 F.3d, 614, 629 (4th Cir. 1999).

13

It is for the Court to determine, as a question of law, whether LandAmerica Assessment owed a legal duty of care to American Capital. *See Pace v. State*, 425 Md. 145, 154, 38 A.3d 418, 423 (2012) (citing *Valentine v. On Target, Inc.,* 353 Md. 544, 549, 727 A.2d 947, 949 (1999)). Generally, duties assumed in a contract will not sustain an action sounding in tort. *Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252, 725 A.2d 1053, 1058 (1999) (citing *Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.,* 308 Md. 18, 32, 517 A.2d 336, 343 (1986)); *see also U.S. Gypsum Co. v. Mayor of Balt.,* 336 Md. 145, 156, 647 A.2d 405, 410 (1994); *Decoster v. Westinghouse Elec. Corp.,* 333 Md. 245, 250-51, 634 A.2d 1330, 1332-33 (1994) (citations omitted).[23] Maryland law recognizes that in negligent misrepresentation cases a tort duty of care may arise from contractual dealings with professionals requiring peculiar skill such as physicians, attorneys, architects and public accountants. *See Jacques v. First Nat'l Bank of Md.,* 307 Md. 527, 541, 515 A.2d 756, 763 (1986). Where the failure to exercise such a recognized duty of care "creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent." *100 Inv. Ltd. P'ship,* 430 Md. at 214, 60 A.3d at 11 (quoting *Jacques,* 307 Md. at 534-35, 515 A.2d at 759-60 (1986).

In *100 Investment Ltd. Partnership,* the Maryland Supreme Court was asked to determine whether a title company could be held liable in tort for performing a negligent title search. The partnership was the customer of the title company and the entity that purchased the real estate in question. The court found that, under these circumstances, the accuracy of the title report went

---

[23] Maryland law generally requires that an action in tort be premised upon a duty imposed by law rather than upon an obligation arising out of the contract itself. *Sun-Lite Glazing Contactors, Inc. v. J.E. Berkowitz, L.P.,* 37 F. App'x at 680 (holding that the alleged duty must be independent of any contractual obligation).

14

to the core of the parties' relationship. *Id.* at 211. The court found the necessary legal equivalent of privity sufficient to impose tort liability. *Id.* at 225 (recognizing that the duty applies to the customer and may extend to other parties in contractual privity or its equivalent for that particular contractual undertaking).[24]

Given the language LandAmerica Assessment purposely included in its Property Condition Reports governing reliance, American Capital maintains that Land America Assessment had to be fully cognizant that a discrete class of third party investors (which ultimately included American Capital) would rely on its work. *See Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 677, 762 A.2d 582, 599 (2000) ("an unidentified third party may be able to recover 'as long as that third party was a member of an identified class of persons whose reliance the [defendant] could actually foresee'") (citation omitted). American Capital argues that LandAmerica Assessment issued the Property Condition Reports with the knowledge that they would be circulated to prospective investors in securities backed by the Loans. LandAmerica Assessment authorized Wachovia to circulate the Property Condition Reports for that particular purpose. American Capital claims that, as an investor in the Wachovia Trust, it was authorized to rely upon them.

It is American Capital's Kierkegaardian leap from this point that gives the Court pause. American Capital readily admits that it is not pursuing losses as an investor in the Wachovia Trust. It denies that it is a third party beneficiary of LandAmerica Assessment's contract with the Borrower.[25] American Capital does not argue that LandAmerica Assessment assumed any

---

[24] The court noted that those in contractual privity or its equivalent with the title company for that particular transaction might include a lending bank or property seller or buyer who the title company knows are involved with the acquisition of the property and will rely on the particular search between the title company and the customer. *100 Inv. Ltd. P'ship*, 430 Md. at 225 note 16. In contrast, the court omitted from this list such indeterminate parties as those who might be involved in subsequent transactions involving the reconveyance of the property.

[25] *See supra* note 18.

15

duty to it as an investor in the CRE Trust. American Capital is seeking to recover damages in an entirely different capacity than that of a prospective investor in securities issued by Wachovia. It is pursuing reimbursement of expenses it incurred as the owner of the special purpose entities that purchased the Apartment Complexes. This follows, American Capital argues, from its self-asserted right to mitigate damages on behalf of the CRE Trust.[26] American Capital equates its investment interest in the Subordinated Certificates with a participation interest in the Loans themselves.[27]

The Court finds the string of transactions in which American Capital engaged to be too attenuated to support a proximate claim for tort liability stemming solely from economic loss. There is simply no contractual privity or its equivalent between American Capital in its capacity as owner of the American Capital Special Purpose Entities and LandAmerica Assessment to support the Claim. *See Premium of Am., LLC v. Sanchez,* 213 Md. App. 91, 73 A.3d 343 (2013) (finding no contractual privity or its equivalent between physician who provided life insurer with estimates of life expectancies and investors who entered into viatical settlements involving life insurance policies). The class of prospective Apartment Complex purchasers was an indeterminate class with no intimate nexus with LandAmerica Assessment. The subsequent placement of American Capital, an entity that happened to be an initial investor, into this class

---

[26] *See supra* note 15.

[27] The asserted right of mitigation derives from the threat of possible harm that was triggered by uncertainty surrounding repayment of the defaulted Loans. But, American Capital had no interest in the Loans owned by the Wachovia Trust, nor did it have an interest in the collateral that secured the Loans. It was not an interest of American Capital that allegedly became endangered. American Capital's interest was confined to its $24,699,102.48 investment in the Subordinated Certificates. *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970); *accord Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 603 (2d Cir. 1978) (Damages in a claim founded on an omission related to the purchase of a security are determined by looking to the difference between the purchase price and the subsequent sales price of the security). American Capital does not contend that the value of its Subordinated Certificates was adversely impacted by any alleged negligent misrepresentation. Disregarding the obvious lack of contractual privity or its equivalent, American Capital cannot hold the LAC Trust liable for $10,190,000 in damages on account of expenses it incurred improving properties in which it separately invested.

16

does not render American Capital any less indeterminate. No other third party purchaser could advance such a claim. "[T]he rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct . . . resulting in economic damages . . . [is] to avoid 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *100 Inv. Ltd. P'ship,* 430 Md. at 218, 60 A.3d at 13 (citing *Walpert,* 361 Md. at 671, 762 A.2d at 596 (quoting *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441, 444).

American Capital did not have the right to rely upon the Property Condition Reports for all purposes. It did not have the right to rely upon them in connection with sales transactions that occurred subsequent to the initial decision to invest in securities issued by the Wachovia Trust. The acquisition of the Apartment Complexes by the American Capital Special Purpose Entities is too far removed from the creation of the original contract between the Borrower and LandAmerica Assessment, from the use of that contract by Wachovia in originating the Loans, and from any reliance on that contract by the initial investors in the Wachovia securitization to find an intimate nexus between LandAmerica Assessment and American Capital in this context. LandAmerica Assessment did not prepare the Property Condition Reports with any intended understanding that a buyer of the Apartment Complexes might rely upon them for that purpose. It never undertook to insure the condition of the Apartment Complexes. Tort law imposes no such responsibility.

## Conclusion

The Court will deny the motion for summary judgment filed by American Capital and grant the motion for summary judgment filed by Matson. The Court finds as a matter of law that there is no intimate nexus between the parties sufficient to establish the contractual privity or its equivalent that is necessary for the imposition of tort liability on account of damages allegedly

arising out of the acquisition of the Apartment Complexes. Accordingly, the Claim filed by American Capital against the LAC Trust will be disallowed and expunged. Having reached this determination, the Court need not resolve the remaining issues raised by Matson in his motion for summary judgment.

    A separate order shall issue.

ENTERED: Feb 7 2014 _____

                                            /s/ Kevin R. Huennekens
                               UNITED STATES BANKRUPTCY JUDGE

                               Entered on Docket: 2/7/14